# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

MARK S. SHAW,          )
                              )
         Plaintiff,      )
                              )     CAUSE NO. 1:11-CV-123
        v.             )
                              )
AMERICAN INCOME LIFE   )
INSURANCE COMPANY,    )
                              )
        Defendant.    )

## OPINION AND ORDER

## I.  INTRODUCTION

Plaintiff Mark Shaw, an insurance agent, executed a contract with Defendant American Income Life Insurance Company ("AIL") to sell AIL insurance products.  Shaw was affiliated with the Mark Hancock Agency ("Hancock Agency"), which also separately contracted with AIL to sell its insurance.  While working at the Hancock Agency, Shaw alleges he was subjected to sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964.[1] The viability of Shaw's claims, however, depends on whether he was an independent contractor or an employee of AIL.[2]

In AIL's Motion for Summary Judgment (Docket # 18), which the Court limited to only

---

[1]AIL removed the case to this Court from the Allen Superior Court.  (Docket # 2.)  As Shaw brings Title VII claims, removal was proper under 28 U.S.C. § 1441(a), and subject matter jurisdiction arises under 28 U.S.C. § 1331.  Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting. (Docket # 15.)

[2]After dually filing a discrimination charge against AIL with the Fort Wayne Metropolitan Human Relations Commission ("Commission") and the Equal Employment Opportunity Commission ("EEOC"), the Commission dismissed the charge, finding that Shaw was an independent contractor and, thus, not covered by the law.  (Hollis Aff. ¶ 4, Ex. B.)  The EEOC adopted this finding and dismissed the charge as well.  (Hollis Aff. ¶ 5, Ex. C.)

this question, AIL argues that Shaw was an independent contractor because, among other things, AIL did not control or supervise him, paid him only by commissions, and gave him no employee benefits and that, indeed, Shaw classified himself as a sole proprietor on his tax returns.  In response (Docket # 23), Shaw claims he was an employee of AIL, pointing to the Hancock Agency's relationship with AIL as well as various supervisory actions taken toward him by Tod Brown and Patricia Lee, two other independent AIL agents affiliated with the Hancock Agency.

As the motion is now ripe for ruling, AIL's Motion for Summary Judgment will be GRANTED for the reasons explained in this Opinion and Order.[3]

## II.  THE MOTION TO STRIKE

Along with its Motion for Summary Judgment, AIL filed a Motion to Strike the Affidavit of Mark Shaw (Docket # 25), which was attached to Shaw's Brief in Opposition.  AIL argues that Shaw's affidavit should be stricken in its entirety because it contains statements that are either not based on personal knowledge; constitute inadmissible opinions, speculation, or legal conclusions; are contrary to Shaw's deposition testimony; or duplicate matters about which Shaw already testified.  Shaw has not filed a response to the motion, and the time to do so has since passed.  For the following reasons, the Motion to Strike the Affidavit of Mark Shaw (Docket # 25) will be GRANTED IN PART and DENIED IN PART.

### A.  Applicable Law

Federal Rule of Civil Procedure 56 states that affidavits filed in support of summary judgment "must be made on personal knowledge, set out facts that would be admissible in

---

[3]AIL moved to strike Shaw's Brief in Opposition to Defendant's Motion for Summary Judgment as untimely and contrary to the Court's briefing schedule.  (Docket # 24.)  Because the Court will grant summary judgment to AIL even considering Shaw's Brief in Opposition, this Motion to Strike is deemed MOOT.  Defendant's Request for Summary Ruling on Its Motion for Summary Judgment (Docket # 22) is therefore also deemed MOOT.

evidence, and show that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4). "An affidavit not in compliance with Rule 56 can neither lend support to, nor defeat, a summary judgment motion." *Paniaguas v. Aldon Cos.*, No. 2:04-CV-468-PRC, 2006 WL 2568210, at *4 (N.D. Ind. Sept. 5, 2006) (citing *Zayre Corp. v. S.M. & R. Co.*, 882 F.2d 1145, 1148-49 (7th Cir. 1989); *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989)).

"[W]hen considering a motion to strike portions of an affidavit in support of a motion for summary judgment, courts will only strike and disregard the improper portions of the affidavit and allow all appropriate recitations of fact to stand." *Id.*; *see also Stromsen v. Alumna Shield Indus., Inc.*, No. 89 C 5036, 1993 WL 34727, at *4 (N.D. Ill. Feb. 8, 1993); *Toro Co. v. Krouse, Kern & Co.*, 644 F. Supp. 986, 989 (N.D. Ind. 1986); CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 2738 (3d ed. 2006). Specifically, the following statements are not properly included in an affidavit and should be disregarded: (1) conclusory allegations lacking supporting evidence, *see Abuelyaman v. Ill. State Univ.*, ___ F.3d __, 2011 WL 6188446, at *9 (7th Cir. Dec. 13, 2011); (2) legal argument, *see Pfeil v. Rogers*, 757 F.2d 850, 862 (7th Cir. 1985); (3) self-serving statements without factual support in the record, *Broaddus v. Shields*, __ F.3d __, 2011 WL 6396542, at *7 (7th Cir. Dec. 21, 2011); (4) inferences or opinions not "grounded in observation or other first-hand experience," *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991); (5) mere speculation or conjecture, *see Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999); and (6) statements or conclusions that "contradict prior deposition or other sworn testimony," without explaining the contradiction or attempting to resolve the disparity, *see LaFary v. Rogers Grp., Inc.*, 591 F.3d 903, 908 (7th Cir. 2010); *Buckner v. Sam's*

*Club, Inc.*, 75 F.3d 290, 292 (7th Cir. 1996) (collecting cases); *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 861 (7th Cir. 1985).

### B. Analysis

Here, AIL seeks to strike several paragraphs of Shaw's affidavit for specific, delineated reasons and the remaining paragraphs as irrelevant because they duplicate Shaw's deposition testimony. The Court will address each paragraph in turn.

*1. Paragraphs 6 and 9*: AIL moves to strike Shaw's statement in paragraph 6 regarding "AIL's office in Fort Wayne" and his reference in paragraph 9 that he received training at the Fort Wayne office from Brown "solely at the expense of AIL." In his deposition, however, Shaw acknowledged that he was unsure whether the Fort Wayne office was a division of AIL or the Hancock Agency (Shaw Dep. 81) and that he did not know who incurred the costs of all operational expenses (Shaw Dep. 154). Consequently, Shaw's affidavit statements are not only speculative, but contradict his deposition, and, thus, can be disregarded. *See LaFary*, 591 F.3d at 908; *Stagman*, 176 F.3d at 995. Nonetheless, the Court strikes only the references to "AIL's office" in paragraph 6 (leaving "office in Fort Wayne") and "solely at the expense of AIL" in paragraph 9, letting the rest of the paragraphs stand. *See Paniaguas*, 2006 WL 2568210, at *4.

*2. Paragraphs 10 and 11*: These paragraphs deal with the script Shaw was required to memorize and use verbatim. Paragraph 10 indicates that AIL provided the script, and paragraph 11 states that AIL closely monitored the training on the script's use. These statements, however, directly contradict Shaw's deposition testimony, in which he stated that the Hancock Agency, through Brown and Lee, not AIL, provided him with the script and monitored his use of it. (Shaw Dep. 26-29.) Accordingly, paragraphs 10 and 11 are stricken in their entirety. *See*

*LaFary*, 591 F.3d at 908.

3. *Paragraphs 12, 13, and 15*: Paragraph 12 indicates that AIL trained Shaw about the pay structure, but, in his deposition, Shaw testified that Brown and Lee did all of his training (Shaw Dep. 24-29), and they were not employees of AIL (*see* Hancock Aff. ¶ 3). Similarly, paragraphs 13 and 15 imply that Brown and Lee were employees of AIL, by referring to "Brown of AIL" and "AIL's Brown and Lee." But Shaw admitted that Brown and Lee were *agents* of AIL (Shaw Dep. 81-82), and his mere assertions implying that Brown and Lee were employees of AIL are conclusory and self-serving statements without support in the record. As such, the references to AIL in these paragraphs will be stricken. *See Broaddus*, 2011 WL 6396542, at *7; *Abuelyaman*, 2011 WL 6188446, at *9.

4. *Paragraph 14*: Although AIL seeks to strike paragraph 14 as contradictory, the Court sees no contradiction; therefore, this part of the motion is DENIED.

5. *Paragraph 21*: This paragraph states that Shaw had to report his production numbers every day to "AIL's Indianapolis office." Yet Shaw testified that he would call "the Indianapolis office, the Hancock Agency" to report his numbers. (Shaw Dep. 54.) Consequently, this contradictory reference to AIL in paragraph 21 will be stricken. *See LaFary*, 591 F.3d at 908.

6. *Paragraph 23*: AIL seeks to strike paragraph 23 because it "at the very least" does not accurately reflect Shaw's deposition testimony. While Shaw's claim that he sold only one AIL product (a whole life policy) is potentially misleading, it is not factually incorrect or contradictory to his deposition testimony. Thus, AIL's motion is DENIED as to paragraph 23.

7. *Paragraphs 24, 27, 35, and 36*: These paragraphs all indicate that AIL provided Shaw's book of leads. However, because Shaw testified that the Hancock Agency, and not AIL,

provided these leads (Shaw Dep. 102-03), all references to AIL in paragraphs 24, 27, 35, and 36 are stricken as contradictory to Shaw's deposition. *See LaFary*, 591 F.3d at 908.

*8. Paragraph 26*: This paragraph, stating that AIL set the minimum number of appointments for Shaw's mandatory phone days, contradicts Shaw's deposition testimony that Brown and Lee set this number (Shaw Dep. 64-65), and, therefore, is stricken in its entirety. *See LaFary*, 591 F.3d at 908.

*9. Paragraphs 28 and 40*: Paragraph 28, in which Shaw indicates that "his impression was that AIL was always trying to keep the agents under its 'thumb' and didn't want the agents wandering too far from the supervisor's control," and paragraph 40, stating that the atmosphere, inspired by AIL communications, was to follow the rules or be terminated, are speculative, self-serving statements without support in the record. Moreover, Shaw does not explain his basis of personal knowledge for these impressions. As such, these statements can be disregarded and stricken in their entirety. *See DeLuca v. Winer Indus., Inc.*, 53 F.3d 793, 798 n.5 (7th Cir. 1995).

*10. Paragraph 29*: In this paragraph, Shaw states that he was required to communicate with "AIL's supervisor" on certain days. Shaw alleges that Brown and Lee supervised him, but, as Shaw admitted and noted above, Brown and Lee were AIL's agents and not its employees. (*See* Shaw Dep. 81-82; Hancock Aff. ¶ 3.) Accordingly, this contradictory and inaccurate reference to "AIL's supervisor" is stricken. *See LaFary*, 591 F.3d at 908.

*11. Paragraphs 41-44*: These paragraphs all make assertions that AIL was responsible for the operational expenses associated with the Hancock Agency's Fort Wayne office. As Shaw testified that he did not know who paid for the operational expenses or provided the supplies for that office (Shaw Dep. 154), paragraphs 41-44 contradict Shaw's deposition testimony and will

therefore be stricken in their entirety. *See LaFary*, 591 F.3d at 908.

    *12. Paragraphs 45 and 47*: Paragraph 45, indicating that AIL provided the forms to build packets and dictated their format, and paragraph 47, stating that AIL had a secretarial person that worked in the Fort Wayne office, do not contradict Shaw's deposition (*see* Shaw Dep. 55-56; 23-24); therefore, AIL's motion is DENIED as to paragraphs 45 and 47.

    *13. Paragraph 50*: Shaw's statement in this paragraph that he was required to join a union to work for AIL contradicts his deposition testimony that no one expressly told him that he had to join a union to contract with AIL (Shaw Dep. 154-55); as such, paragraph 50 is stricken in its entirety. *See LaFary*, 591 F.3d at 908.

    *14. Remaining paragraphs*: Finally, AIL moves to strike the remaining paragraphs of Shaw's affidavit as irrelevant because they duplicate his deposition testimony. Although they may be duplicative, the Court DENIES the motion to strike the remainder of Shaw's affidavit. To the extent that the affidavit otherwise contradicts Shaw's prior deposition testimony, the deposition will control. *Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 532 (7th Cir. 1999).

## III. FACTUAL AND PROCEDURAL BACKGROUND[4]

    AIL contracts with licensed insurance agents as independent contractors to market its insurance products based on a tiered system. (Gamble Aff. ¶¶ 3-4.) The highest level agent

---

[4]For summary judgment purposes, the facts are recited in the light most favorable to Shaw, the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). As AIL notes in its Reply, however, under Local Rule 56-1(b)(2), Shaw's response brief was required to include a section labeled "Statement of Genuine Disputes" that identifies the material facts that Shaw contends are genuinely disputed. N.D. Ind. L.R. 56-1(b)(2). While Shaw's response contains this section, rather than identifying the disputed facts that require a trial, Shaw simply concedes, "None based upon the Material Facts." (Pl.'s Br. in Opp. 9.) Accordingly, the Court is permitted to treat AIL's facts as admitted without controversy. *See Norman v. United States*, No. 2:11-CV-097, 2011 WL 5408479, at *2 (N.D. Ind. Nov. 8, 2011); *Chappey v. INEOS USA, LLC*, No. 2:08-cv-271, 2011 WL 3610407, at *2-3 (N.D. Ind. Aug. 17, 2011). However, even considering Shaw's version of the facts (as contained in the parts of his affidavit that have not been stricken), Shaw's response is insufficient to defeat the motion for summary judgment. *See Lewis v. Ahmed*, No. 3:10-CV-272 JVB, 2012 WL 75814, at *1 (N.D. Ind. Jan. 9, 2012).

contract is with what AIL calls a state general agent ("SGA"); the next tier is a regional general

agent ("RGA") contract followed by a master general agent ("MGA") contract. (Gamble Aff. ¶

4.) AIL also offers basic agent contracts. (Gamble Aff. ¶ 5.) Basic agents, such as Shaw, are

usually affiliated with a particular SGA, but AIL does not mandate with whom a SGA can

contract. (Gamble Aff. ¶ 5.)

The Hancock Agency is an independently contracted SGA of AIL with offices in Fort

Wayne and Indianapolis. (Hancock Aff. ¶ 2.) Brown is an independently contracted RGA of

AIL and conducts business at the Hancock Agency. (Shaw Dep. 82; Hancock Aff. ¶ 3.) Lee is

an independently contracted MGA of AIL and also conducts business at the Hancock Agency.

(Shaw Dep. 81-82; Hancock Aff. ¶ 3.)

In December 2009, Shaw became affiliated with the Hancock Agency and executed a

basic agent contract with AIL. (Shaw Dep. 16-17; Gamble Aff. ¶ 11; Hancock Aff. ¶ 3.) In

describing the relationship between Shaw and AIL, the contract explicitly states the following:

> The Agent is not an employee of the Company; rather, the agent is an independent
> contractor. The Agent has no fixed hours and is free to choose the time and manner
> in which services are performed. The Agent shall not represent or imply that the
> Agent is an employee or officer of the Company, or a person having general
> authority to transact business for the Company. The Agent will not be treated as an
> employee with respect to services performed under this contract for federal and state
> tax purposes. As an independent contractor, the Agent is not eligible for
> unemployment benefits or worker's compensation.

(Shaw Dep. Ex 1.) Shaw testified that he understood this provision at the time he signed the

contract. (Shaw Dep. 128.) The contract further provided that Shaw would be responsible for

all expenses incurred in producing insurance for AIL and for furnishing his own means of

transportation, office space, or other relevant expenses. (Shaw Dep. Ex. 1.) Moreover, either

party could terminate the contract without cause by giving 30 days notice, but Shaw could not

maintain a contract with any other insurance company outside AIL's holding company during his contract term.  (Shaw Dep. Ex. 1.)  The contract also stated that Shaw would receive commissions from AIL.  (Shaw Dep. Ex. 1.)

Along with the contract, Shaw also executed a "Special Notice Acknowledgment" with AIL, which reiterated Shaw's status as an independent contractor and that he would be paid on a commission basis.  (Shaw Dep. Ex. 6.)  The acknowledgment explicitly states, "I understand that I will not be an employee of American Income; rather, I will work as an independent contractor for American Income," which Shaw testified he understood at the time he signed the form.  (Shaw Dep. 129-30, Ex. 6.)

To become a licensed insurance agent in Indiana, Shaw had to pass a state examination.  (Shaw Dep. 19; Shaw Aff. ¶ 5.)  Shaw paid for the exam and preparatory classes himself and was not reimbursed for those expenses.  (Shaw Dep. 19-22.)  Once licensed, Shaw began to work with Brown at the Hancock Agency's Fort Wayne office.  (*See* Shaw Dep. 22-23.)  During the first month of his employment, Shaw was responsible for opening the office two days a week to conduct scheduled interviews.  (Shaw Dep. 22-23.)  Initially, Shaw worked five, sometimes six, days a week in the Fort Wayne office.  (Shaw Dep. 25; Shaw Aff. ¶ 8.)  Shaw received extensive training from Brown, including memorizing a script and using it verbatim to pitch to potential customers.  (Shaw Dep. 25-26.)  Brown provided Shaw with this script, which Shaw believed was prepared by Mark Hancock (of the Hancock Agency).  (Shaw Dep. 26-27.)  According to Shaw, at the beginning, he was trained solely by Brown, who stressed the importance of following the script without deviations and tested him on it.  (Shaw Dep. 27-29.)  Although Shaw sometimes deviated from the script, he was never docked any commissions for doing so.

(Shaw Dep. 28.)  Lee, an MGA of AIL, also tested Shaw on the script.  (Shaw Dep. 29.)

At the end of each day, Shaw had to call into the Hancock Agency's Indianapolis office and report his production numbers.  (Shaw Dep. 53-54.)  Brown required Shaw to call him each night as well (Shaw Dep. 53-54; Shaw Aff. ¶ 21) partly, according to Shaw, so Brown would know Shaw's daily numbers (Shaw Dep. 51).  Shaw, however, never lost any commissions or suffered any other tangible loss for failing to call Brown.  (Shaw Dep. 55.)

AIL was not involved with Shaw's training or pitching methods.  (Gamble Aff. ¶ 12.) Although the Hancock Agency conducted mandatory meetings in both Fort Wayne and Indianapolis (Shaw Aff. ¶¶ 16, 20), AIL did not (Gamble Aff. ¶ 6), and Shaw did not lose commissions or face any other tangible loss for failing to attend (Shaw Dep. 75-78).  Shaw never visited AIL's Indianapolis or Texas offices.  (Shaw Dep. 112.)  As was true for all its agents, AIL never established any work schedule or reporting requirements for Shaw and did not require Shaw to account for his hours worked or his number of client appointments. (Gamble Aff. ¶¶ 6, 12.)  Because AIL targeted members of unions, associations, and credit unions, AIL agents were encouraged to join a union to appeal to this customer base.  (Gamble Aff. ¶ 9.)  Shaw became a member of the union; he testified that it was implied that he was required to join, but that no one explicitly told him he had to join the union to contract with AIL.  (Shaw Dep. 154-55.)

Potential clients were identified from leads provided by the Hancock Agency's Indianapolis office, through Brown and later Lee, and referrals.  (Shaw Dep. 102-03, 105.)  Shaw maintains that he was verbally required to at least attempt to call everyone on the leads list. (Shaw Dep. 103-05.)

Shaw's daily work schedule varied.  (Shaw Dep. 68.)  At least twice a week, Shaw had

"phone call days" lasting from five to eight hours, where he called leads and set appointments. (Shaw Dep. 62-63, 66.) According to Shaw, Brown and Lee wanted these calls made in the office rather than at home. (Shaw Dep. 109-10.) Other days, Shaw chose to conduct customer appointments and door knocks on potential customers. (Shaw Dep. 67, 73.) The length of a customer call varied from 15 or 20 minutes to, on occasion, several hours. (Shaw Dep. 69-70.) When Shaw went to call on potential customers, he used his own vehicle and was not reimbursed for any mileage or other related expenses. (Shaw Dep. 110-11.) Shaw was also responsible for the charges incurred on his cell phone when he called customers. (Shaw Dep. 111-12.) According to AIL, its agents are responsible for all expenses associated with their role, and it does not pay for supplies, office expenses, furniture, or other associated costs. (Gamble Aff. ¶ 8.) Consequently, the Hancock Agency paid for all operational expenses associated with its Fort Wayne and Indianapolis offices and was not reimbursed by AIL for those expenses. (Hancock Aff. ¶ 2.) Shaw claims, however, that AIL provided the forms needed to build packets given to potential customers and dictated their format. (Shaw Aff. ¶ 45.)

Shaw was not required to work a certain number of hours per day. (Shaw Dep. 100.) He did not punch a time clock, turn in a time sheet, or otherwise report his hours worked to anyone. (Shaw Dep. 100.) Shaw maintains, however, that Brown and Lee required him to be available by telephone, or otherwise, on Monday, and on other days, except Sunday, as necessary. (Shaw Aff. ¶ 29.) Shaw tried to sell only whole life insurance, but could have sold other products if he desired. (Shaw Dep. 100-01.) As AIL did not limit Shaw to any specific geographic region, Shaw could sell to any customer in Indiana. (Shaw Dep. 101; *see* Gamble Aff. ¶ 6.) Neither AIL nor the Hancock Agency reviewed Shaw's performance. (Shaw Dep. 86; Gamble Aff. ¶

12.)

AIL compensated Shaw exclusively through sales commissions and, if he qualified, a weekly bonus.  (Shaw Dep. 112.)  AIL also provided Shaw with an Internal Revenue Service ("IRS") Form 1099, from which no federal or state income or social security taxes were withheld.  (Shaw Dep. 114-15, Ex. 4.)  Shaw further classified himself as an "individual/sole proprietor" on his W-9 form for 2010.  (Shaw Dep. 114, Ex. 3.)

AIL did not provide Shaw with health insurance, paid vacation, sick days, or paid holidays.  (Shaw Dep. 123-24.)  Shaw did receive a $15,000 life insurance policy and a prescription drug discount card from AIL, but Shaw was still responsible for all his healthcare costs.  (Shaw Dep. 117, 122; Shaw Aff. ¶ 48.)  As laid out in the contract, Shaw was not eligible for retirement, worker's compensation, or unemployment benefits.  (Shaw Dep. 123-26, Ex. 1; Gamble Aff. ¶ 12.)  For one year after the contract's termination, Shaw could not sell life or health insurance using AIL's sales procedures in any territory in which he worked the year before the termination.  (Shaw Dep. Ex. 1.)

## IV.  STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact.  *Payne*, 337 F.3d at 770.  When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder."  *Id.*  The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial."  *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 507 (7th Cir. 2010) (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)).

If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770. A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

## V. DISCUSSION

Because Title VII does not protect independent contractors, Shaw must prove he was an employee of AIL to maintain a Title VII action against the company. *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 380 (7th Cir. 1991). As explained below, Shaw cannot bear this burden, thereby entitling AIL to summary judgment.

### A. Shaw Was an Independent Contractor of AIL as a Matter of Law

When determining whether an employer-employee relationship existed, "courts look to the economic realities of the relationship and the degree of control the employer exercises over the alleged employee." *Id.* (citation and internal quotation marks omitted). In applying this test, courts within the Seventh Circuit Court of Appeals focus on the following five factors:

> (1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the kind of occupation and nature of skill required, (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations, (4) method and form of payment and benefits, and (5) length of job commitment and/or expectations.[5]

---

[5] Although Shaw also addresses an eleven-factor test used by other courts, the Seventh Circuit has stated that this five-step inquiry encompasses all the factors these other courts have identified. *Knight*, 950 F.2d at 379 n.2. As such, the Court confines its analysis to the five-step inquiry.

*Id.* at 378-79 (citations omitted). While no factor is determinative, the employer's right to control the alleged employee is the most important. *Id.* (citations omitted); *U.S. Equal Emp't Opportunity Comm'n v. Catholic Knights Ins. Soc'y*, 915 F. Supp. 25, 28 (N.D. Ill. 1996) (citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 324-26 (1992)).

      *1. Control and Supervision*

      To determine whether the employer exercises sufficient control or supervision over the worker to establish an employer-employee relationship, courts consider several factors. In the context of insurance agents, these factors include whether the agents can set their own hours, choose the method to sell their product, and decide which products to offer; if so, they are more likely independent contractors than employees. *Knight*, 950 F.2d at 379-80; *Johnson v. Equitable Life Assurance Soc'y of the U.S.*, No. 96 C 2418, 1997 WL 417409, at *3 (N.D. Ill. July 22, 1997); *see Durst v. Ill. Farmers Ins. Co.*, No. 05 C 574, 2006 WL 1519322, at *2 (N.D. Ill. May 31, 2006) (pointing out that insurance agent was an independent contractor when he "was free to manage his own schedule and to determine the manner in which he conducted his business"); *E.E.O.C.*, 915 F. Supp. at 30 (noting that insurance agents, found to be independent contractors, did not have established times and days of work); *Dixon v. Burman*, 593 F. Supp. 6, 10 (N.D. Ind. 1983), *aff'd*, 742 F.2d 1459 (7th Cir. 1984) (finding that insurance agents who, among other things, could set their own hours and schedules were independent contractors).

      Besides discretion to manage their schedules and determine their sales methods and customers, courts also look at whether insurance agents were required to report their hours worked or daily activities. *Johnson*, 1997 WL 417409, at *3; *Knight v. United Farm Bureau Mutual Ins. Co.*, 742 F. Supp. 518, 521 (N.D. Ind. 1990), *aff'd*, 950 F.2d 377 (7th Cir. 1991);

*Dixon*, 593 F. Supp. at 10; *cf. Worth v. Tyer*, 276 F.3d 249, 263 (7th Cir. 2001) (finding that worker at title company presented significant evidence that her employer controlled her actions when her schedule was dictated and she was required to submit a timecard). If agents were not required to report their time or daily activities, this lends further support to the conclusion that they are independent contractors. *E.g.*, *Johnson*, 1997 WL 417409, at *3.

Another factor in the control analysis is whether insurance agents are restricted in where they can sell their products or in what products they can sell. If agents are free to sell their products anywhere in their licensing state and are not limited to a specific area, this supports a finding that they are independent contractors. *Durst*, 2006 WL 1519322, at *2; *Johnson*, 1997 WL 417409, at *3; *E.E.O.C.*, 915 F. Supp. at 30; *Dixon*, 593 F. Supp. at 10; *cf. Knight*, 742 F. Supp. at 521 (noting that employer exercised some control over an insurance agent who had geographic restrictions on her sales area). Similarly, an employer's control over an alleged employee is further deteriorated when the agreement is non-exclusive, allowing the agent to sell other companies' products. *E.E.O.C.*, 915 F. Supp. at 30; *Dixon*, 593 F. Supp. at 11; *cf. Knight*, 742 F. Supp. at 522 n.1 (pointing out that the agent was not free to sell other insurers' products in the control analysis). However, this factor is not determinative of a claimant's status. *Knight*, 742 F. Supp. at 522 n.1 (citing *E.E.O.C. v. Zippo Mfg. Co.*, 713 F.2d 32 (3d Cir. 1983)). Even when the employer institutes a mass-marketing program and requires that agents use company form letters, this level of control is still insufficient to establish an employer-employee relationship. *See E.E.O.C.*, 915 F. Supp. at 29.

On the other hand, an employer's control over a worker is strengthened when the worker is required to be in the office on certain days, *Knight*, 742 F. Supp. at 521, attend meetings,

*Johnson*, 1997 WL 417409, at *3; *Knight*, 742 F. Supp. at 521, or submit sales reports, *E.E.O.C.*, 915 F. Supp. at 29. At the same time, "attending meetings does not create an employment relationship." *Jones v. A.W. Holdings, LLC.*, No: 1:09cv284 WCL, 2011 WL 488634, at *6 (N.D. Ind. Feb. 7, 2011); *see Dixon*, 593 F. Supp. at 12 (finding requirement that insurance agent attend weekly meetings was insufficient to create employment relationship). If there are no significant consequences for failing to attend a meeting, then this control is lessened. *See Johnson*, 1997 WL 417409, at *3 (finding employer had little control over an agent by holding monthly meetings when agent indicated the only consequence for failing to attend was receiving a call from the district manager). Moreover, while requiring an agent to submit sales reports does illustrate an amount of control, that control is minimal when the reports are used as a tool to assess an agent's production. *E.E.O.C.*, 915 F. Supp. at 29. Although training or supervision, such as periodic evaluations, demonstrate some control over alleged employees, *see Knight*, 742 F. Supp. at 521, simply undergoing training does not transform independent contractors into employees, *see Jones*, 2011 WL 488634, at *6.

Here, while Brown required Shaw to be in the office for "phone call days" twice a week, Shaw could set his own hours for those days and for the days he was out on customer calls. Based on the customer's availability, Shaw also set his own appointment times and decided whether to conduct "door knocks" on potential customers, all of which weighs in favor of finding him to be an independent contractor. *See Durst*, 2006 WL 1519322, at *2; *E.E.O.C.*, 915 F. Supp. at 30; *Dixon*, 593 F. Supp. at 10. Shaw further testified that he attempted to sell only whole life insurance, but that other AIL products were available for him to sell. (Shaw Dep. 100-01.) Therefore, Shaw was free to choose what products to sell to potential customers, just as

other insurance agents found to be independent contractors did, *see Knight*, 950 F.2d at 379-80; *Johnson*, 1997 WL 417409, at *3; the fact that he choose not to sell these products does not transform him into an employee.

Although Shaw had to use a script to pitch to potential customers and was verbally required to attempt to contact every person on the leads list (calls that Brown and Lee wanted to be performed from the office), these requirements came from the Hancock Agency, specifically Brown and Lee, and not AIL. As a matter of fact, based on this record, Brown and Lee, who were themselves independent contractors of both AIL and the Hancock Agency (Hancock Aff. ¶ 3), were responsible for all Shaw's supervision and training and most of his work requirements. AIL maintains that it was not involved with Shaw's training or pitching methods (Gamble Aff. ¶ 12), and Shaw presents no evidence to dispute this. The only evidence of AIL's control that Shaw produces is that AIL dictated the format of the packets given to customers, which is an insufficient amount of control to make Shaw an employee. *See E.E.O.C.*, 915 F. Supp. at 29 (finding that it was not a strong showing of control to require agents to use company form letters).

Furthermore, AIL did not limit Shaw to any geographic area, but allowed him to sell AIL products anywhere in Indiana, illustrating AIL's minimal control over Shaw. *See Durst*, 2006 WL 1519322, at *2; *Johnson*, 1997 WL 417409, at *3; *E.E.O.C.*, 915 F. Supp. at 30; *Dixon*, 593 F. Supp. at 10. While the agreement between AIL and Shaw was exclusive and prohibited him from selling other insurers' products, this factor is not determinative of Shaw's status. *Knight*, 742 F. Supp. at 522 n.1.

Shaw was also required to report his production numbers daily via telephone to the

Hancock Agency's Indianapolis office and to talk to Brown about his numbers each night. These calls, however, appear to be a tool of assessing his production, which suggests this control was minimal. *E.E.O.C.*, 915 F. Supp. at 29. And, once again, this was control by Brown and the Hancock Agency, not AIL. Despite this call requirement, Shaw did not fill out a timecard or otherwise report his hours to anyone, which suggests that the control exerted was insufficient to make Shaw an employee. *E.g.*, *Johnson*, 1997 WL 417409, at *3; *cf. Worth*, 276 F.3d at 263 (finding significant control when worker had to submit timecard).

In addition to these calls, Shaw had to attend mandatory meetings at the Hancock Agency's Fort Wayne and Indianapolis offices; yet, these were the Hancock Agency's meetings, not AIL's. Even if AIL had held such meetings, "attending meetings does not create an employment relationship." *Jones*, 2011 WL 488634, at *6. Moreover, Shaw did not lose commissions or suffer any other tangible loss for failing to attend these meetings (Shaw Dep. 75-78), which further indicates a lack of control. *See Johnson*, 1997 WL 417409, at *3. Shaw also maintains that he underwent a significant amount of training from Brown and Lee, but simply undergoing training does not transform independent contractors into employees, *see Jones*, 2011 WL 488634, at *6, and receiving training from Brown and Lee, themselves independent contractors of AIL, does not make Shaw an employee of AIL. Furthermore, neither the Hancock Agency nor AIL evaluated Shaw's performance, suggesting a lesser amount of control and supervision than Shaw alleges. *See Knight*, 742 F. Supp. at 521.

Therefore, even though Shaw has presented evidence that Brown and Lee exerted some control over him, he fails to present any significant evidence that AIL itself controlled or supervised him. Because the level of control the Hancock Agency exerted through Brown and

Lee is insufficient to make Shaw an employee of AIL, the control factor weighs in favor of a finding that Shaw was an independent contractor of AIL.

### 2. *Kind of Occupation and Nature of Skill*

As for the second factor, the Seventh Circuit has held that "[a]n individual's unique work skills may indicate independent contractor status. However, if the individual requires substantial training and supervision, an employee/employer status is more likely." *Worth*, 276 F.3d at 263 (citations omitted). For insurance agents in particular, they are required to pass state examinations, which supports a finding that they undertake skilled work. *Durst*, 2006 WL 1519322, at *3. However, training provided to new insurance agents and reimbursements to agents for travel to seminars can support a finding of employee status. *Johnson*, 1997 WL 417409, at *3. Along with training, the financial interdependence between the employer and worker should also be considered. *Knight*, 742 F. Supp. at 522. In *Knight*, although the agent developed her skills through a combination of her work experience and employer-provided training, was not free to sell other insurers's products, and performed duties integral to the employer's business, the district court found that because she was free to leave at any time and sell in the same area for other insurers, the degree of economic control did not rise to such a level as to be entitled to significant weight, though it was a close call. *Id.* The Seventh Circuit affirmed and agreed that the fact that an agent's sales are integral to the insurer's business is not conclusive. *Knight*, 950 F.2d at 381.

In the instant case, although Shaw was required to pass the state licensing examination, supporting a finding that Shaw did skilled work, *Durst*, 2006 WL 1519322, at *3, he also received training from Brown and Lee as a new agent, which cuts the other way, *Johnson*, 1997

WL 417409, at *3. Shaw's situation, however, is somewhat analogous to the insurance agent in *Knight*, 742 F. Supp. at 522. While he developed his skills through a combination of work experience and training provided by the Hancock Agency, could not sell other insurers' products, and performed duties integral to the Hancock Agency's and AIL's business, he was free to leave at any time after giving AIL 30 days notice, and he could then sell in the same area for other insurers, provided that he did not utilize AIL's union, credit union, or association sales procedures. *Id.* On the other hand, unlike *Knight*, AIL was one step removed from Shaw as there were three parties involved here—AIL, the Hancock Agency, and Shaw—and not just two; AIL did not provide Shaw any training, but only required that he become licensed. Accordingly, this case is not as close a call as in *Knight* and, as such, the degree of AIL's economic control over Shaw did not rise to such a level as to be entitled to significant weight. *See id.*

### 3. Costs of Operation

The third factor considers who assumes the costs of operation such as office space, supplies, advertising, transportation, and other business expenses. *Johnson*, 1997 WL 417409, at *3. If the employer does not provide the workers with office space or supplies or reimburse them for advertising, personal expenses, stationary, or other business and travel expenses, this factor favors a finding of independent contractor status. *Id.*; *see Knight*, 742 F. Supp. at 523 (noting that agent paid her own travel and business expenses); *Dixon*, 593 F. Supp. at 10 (pointing out that agent was not reimbursed for travel or other business expenses such as mileage or fuel consumed in pursuit of insurance sales). In contrast, if the employer provides office space, secretarial support, most necessary supplies, and educational programs, then the worker may be an employee. *Knight*, 742 F. Supp. at 522-23.

Here, Shaw paid for all the expenses associated with obtaining his license, such as the preparatory class and the exam fee. Moreover, the contract between AIL and Shaw explicitly stated that Shaw was responsible for all expenses incurred in producing insurance, including transportation, office space, advertisements, letterheads, and the like, a provision that was reiterated in the acknowledgment Shaw also signed and the affidavit of AIL's Senior Vice President of Agency. (Shaw Dep. Ex. 1; Gamble Aff. ¶ 8.) Shaw admitted that he paid for his own vehicle and automobile insurance and was not reimbursed for mileage or any other expenses related to his vehicle, which is indicative of independent contractor status. *See Dixon*, 593 F. Supp. at 10. Furthermore, Shaw paid for the cell phone he used to call potential customers and was not reimbursed for those charges. Shaw did not pay for the office building in Fort Wayne or the equipment or supplies there; rather, the Hancock Agency paid for all operational expenses associated with both its Fort Wayne and Indianapolis offices, and AIL did not reimburse it. (Hancock Aff. ¶ 2.) Although Shaw states that AIL provided him with the forms to build packets for potential customers (Shaw Aff. ¶ 45), Shaw presents no other evidence that AIL was responsible for any expenses. Therefore, as AIL did not assume the costs of operation or reimburse Shaw for business or travel expenses, this factor favors a finding that Shaw was an independent contractor. *Johnson*, 1997 WL 417409, at *3.

### 4. Method and Form of Payment and Benefits

Under the fourth factor, if the worker is paid on a commission, rather than salary, basis, without federal or state income taxes or social security being withheld, this supports a finding of independent contractor status. *Knight*, 950 F.2d at 379; *Durst*, 2006 WL 1519322, at *3; *Johnson*, 1997 WL 417409, at *4; *E.E.O.C.*, 915 F. Supp. at 30; *Dixon*, 593 F. Supp. at 10.

Workers who report their earnings on a IRS 1099 Form or otherwise represent to the IRS that they are self-employed or sole proprietors lend further support to this finding. *Jones*, 2011 WL 488634, at *7; *Durst*, 2006 WL 1519322, at *3; *E.E.O.C.*, 915 F. Supp. at 30; *Knight*, 742 F. Supp. at 523; *Dixon*, 593 F. Supp. at 9. Additionally, when the employer does not provide benefits, such as health and disability insurance or a retirement plan, or any paid vacations, medical leave, sick time, or holidays, the arrangement has been found to indicate independent contractor status. *See Worth*, 276 F.3d at 264; *Jones*, 2011 WL 488634, at *7; *Johnson*, 1997 WL 417409, at *4; *Knight*, 742 F. Supp. at 523; *Dixon*, 593 F. Supp. at 10-11. Similarly, if the employer does not pay unemployment or worker's compensation, then the worker is more likely an independent contractor. *See Knight*, 742 F. Supp. at 523; *Dixon*, 593 F. Supp. at 10.

Here, AIL paid Shaw through sales commissions and gave him an IRS Form 1099, from which no federal or state income or social security taxes were withheld. Moreover, Shaw identified himself as a sole proprietor on his W-9 for 2010. While AIL provided Shaw with a $15,000 life insurance policy and a prescription drug discount card, AIL did not otherwise give Shaw health insurance, disability insurance, or retirement benefits and did not provide him with paid vacation, sick days, or paid holidays. Even with the prescription drug discount card, Shaw was still responsible for paying for his healthcare services. Shaw was not eligible for unemployment or worker's compensation benefits either. Therefore, under the fourth factor, the arrangement between AIL and Shaw supports a finding that Shaw was an independent contractor. *See, e.g.*, *Knight*, 742 F. Supp. at 523.

   *5. Length of Job Commitment and Expectations*

The last factor looks at the length of the worker's job commitment and the parties'

expectations.  Generally, "[c]ontracts of a set length . . . indicate independent contractor status."

*Worth*, 276 F.3d at 264.  Courts have held, however, that if the contract between the employer

and the worker includes a provision which allows either party to terminate the contract without

cause upon 30 days notice, "this favors—albeit ever so slightly—a finding that [the agent] was

an independent contractor."  *Johnson*, 1997 WL 417409, at *4; *accord Knight*, 950 F.2d at 379

(recounting the district court's finding); *Jones*, 2011 WL 488634, at *7.  Besides the termination

provision, courts also look at the contract's language to determine the parties' intent and

expectations.  *Johnson*, 1997 WL 417409, at *4.  If the contract clearly indicates that the agent is

to be an independent contractor, then the agent could not have had job expectations as an

employee, which favors a finding of  independent contractor status.  *Durst*, 2006 WL 1519322,

at *4; *Johnson*, 1997 WL 417409, at *4.

In Shaw's case, his contract with AIL provided that either party could terminate the

contract without cause upon 30 days notice, which "favors—albeit ever so slightly—a finding

that [Shaw] was an independent contractor."  *Johnson*, 1997 WL 417409, at *4.  Furthermore,

the contract clearly stated that Shaw was "not an employee of [AIL]; rather, the agent is an

independent contractor," which Shaw understood at the time of execution and was reiterated in

the acknowledgment that he also signed.  (Shaw Dep. Ex. 1.)  As such, Shaw could not have had

job expectations as an AIL's employee, which leads to the conclusion that he was an

independent contractor.  *Durst*, 2006 WL 1519322, at *4; *Johnson*, 1997 WL 417409, at *4.

Consequently, after applying the five-step inquiry, the totality of the undisputed facts

show that Shaw was an independent contractor of AIL.  Therefore, as no reasonable trier of fact

could find that Shaw was an employee of AIL, AIL is entitled to summary judgment.  *Durst*,

2006 WL 1519322, at *4.

### B.  The Hancock Agency, Brown, and Lee Are Not Employees of AIL On This Record

Almost as an afterthought, Shaw argues that, because the Hancock Agency was acting as a disclosed and known agent on AIL's behalf in training Shaw, providing the costs of operation, and the like, "it appears disingenuous to categorize AIL as somehow not being responsible for the facts that constitute the economic realities of this case."  (Pl.'s Br. in Opp. 21.)  This argument, however, is wholly undeveloped and not supported by a single authority.  Such undeveloped arguments are considered waived.  *United States v. Hassebrock*, 663 F.3d 906, 914 (7th Cir. 2011); *Trentadue v. Redmon*, 619 F.3d 648, 654 (7th Cir. 2010); *see also United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("We have repeatedly made clear that perfunctory and undeveloped arguments that are unsupported by pertinent authority are waived.").

Moreover, AIL provides evidence, which Shaw does not dispute, that the Hancock Agency is an independently contracted SGA of AIL and that Brown and Lee were independent contractors of both AIL and the Hancock Agency.  (Hancock Aff. ¶ 3; Gamble Aff. ¶ 10.)  While Shaw points to several ways that Brown and Lee allegedly controlled or supervised him, he fails to present any significant evidence, besides his own unsupported (and stricken) speculation, that AIL itself actually supervised, controlled, or otherwise placed requirements on his performance. But reliance on speculation is not enough to get the case to a jury.  *Overly v. KeyBank Nat'l Ass'n*, 662 F.3d 856, 864 (7th Cir. 2011); *see Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-07 (7th Cir. 2009) (stating that to survive summary judgment "the nonmoving party must point to specific facts showing that there is a genuine issue for trial; inferences relying on

mere speculation or conjecture will not suffice"). As summary judgment is "the put up or shut up moment in a lawsuit," *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007), Shaw's speculative and unsupported belief that Brown and Lee were employees of AIL, wholly contradicted by the evidence in the record, is insufficient to create a genuine issue of material fact for trial. As such, AIL is entitled to summary judgment on Shaw's Title VII claim.

## VI. CONCLUSION

For the reasons set forth above, the Court GRANTS Defendant's Motion for Summary Judgment (Docket # 18) and DIRECTS the Clerk to enter judgment in favor of Defendant and against Plaintiff.

SO ORDERED.

Entered this 7th day of February, 2012.

/s/ Roger B. Cosbey
Roger B. Cosbey
United States Magistrate Judge